# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 C 6823 | **DATE** | 1/25/2012 |
| **CASE TITLE** | Craig Warner vs. USF Holland Inc. | | |

**DOCKET ENTRY TEXT**

Defendant's motion for summary judgment [31] is granted.

■[ For further details see text below.]

Docketing to mail notices.
*Mail AO 450 form.

## STATEMENT

    **Introduction.** This is a Title VII same-sex harassment case. Plaintiff Craig Warner was a truck driver for USF Holland Inc. He alleges that Steve Chymka, his immediate supervisor, made sexual comments to him for over 18 months. Plaintiff believes Chymka was bisexual and that these comments were implied sexual overtures. Then, in May 2007, plaintiff complained to a supervisor that he did not appreciate the comments. In June 2007, according to plaintiff, Chymka made an explicit sexual proposition in the men's bathroom. Plaintiff was fired three months later. He believes the firing was in retaliation for his complaint in May 2007. Defendant Holland asserts that plaintiff's firing was a valid business decision not motivated by a discriminatory animus toward men. Holland alleges that plaintiff had a long history of violating company rules over his 10-year career and that he was fired in August 2007 after a surveillance team showed that he submitted a false driver's manifest covering up, among other things, a two-hour lunch. The firing was upheld by an independent grievance committee. As explained below, Holland's motion for summary judgment is granted.

    **Factual Background.** Craig Warner was hired by Holland in 1996. He worked as a pick-up and delivery driver in the Chicago area. During the ensuing ten years, he was cited numerous times for violating company rules. He claims the violations were unfounded.

    On August 13, 2007, plaintiff came to work and was told that the company had conducted a surveillance of his driving on August 9th and had concluded his driver's manifest was false. The manifest is a daily log Holland drivers must fill out while driving. Although plaintiff's manifest contained several false entries, according to Holland, the most prominent was a failure to disclose he had taken a two-hour lunch. Plaintiff was asked to explain the discrepancies and said he couldn't remember what happened and also that he didn't want to respond to the accusations until he spoke with his Union agent, Ed Urbaniak, who was on vacation. The company then fired plaintiff for "proven dishonesty," an offense which the Collective Bargaining Agreement ("CBA") entered into between the Union and the company defines as first-time fireable offense.

    Plaintiff then appealed the decision through a comprehensive grievance procedure mandated by the

**STATEMENT**

CBA. The first step was an informal meeting with the company (referred to as the "Local"), which took place on August 28th. At the Local, plaintiff and Urbaniak explained that he had a family crisis on August 9th. Plaintiff's 11-year old daughter, who had problems with violence, was apparently hitting plaintiff's mother-in-law who was babysitting her. Plaintiff called his wife and a policeman friend who plaintiff asked to go over and talk to his daughter. After listening to the presentation, Neal London (the company's labor relations manager) was unconvinced: "If it was anybody but Craig Warner, I'd believe it." (Pl. Dep. 169; Dep. Ex. 40).

The next step was a hearing before the Grievance Committee. As required by the CBA, the Committee consisted of three Union representatives and three industry representatives none whom could be Holland employees. This hearing took place on August 31st at a Holiday Inn in Willowbrook. Urbaniak explained again how plaintiff was dealing with a family crisis that afternoon. At one point a Committee member asked about a different entry on the manifest indicating plaintiff spent only three minutes making a delivery to Unisource, an assertion the member thought was impossible. (Ex. 40 at 5.) According to plaintiff's later deposition testimony, he and Urbaniak had a disagreement about how to respond. Here is plaintiff's description of what happened:

> So they made a big issue [about the Unisource error] and I tried to explain that to Ed Urbaniak, that, you know, they're discharging me for dishonesty and I want to set the record straight and be honest with them about my defense. And he told me to keep my mouth shut, that he would handle it all and don't say nothing about anything in the manifest.

(Pl. Dep. 170.) After deliberating for a short period, the Committee upheld the company's decision.

Thereafter, plaintiff pursued a claim with his Union alleging that Urbaniak failed to properly represent him. On October 26, 2007, plaintiff wrote a long letter to the Union president, James Hoffa, complaining that Urbaniak wouldn't let plaintiff speak at the hearing. (Ex. 39.) Plaintiff also explained that he didn't mention the family crisis excuse when first confronted on August 13th because his supervisor, Steve Chymka, was in the meeting and plaintiff was afraid Chymka "would have told everyone my situation." (*Id.*) Plaintiff added: "I had disagreements with [Chymka] in the past with another company when we drove together." (*Id.*) But plaintiff did not mention his current allegations that Chymka was sexually harassing him. The NLRB claim was denied. (Pl. Dep. 215.)

This lawsuit followed. Plaintiff makes four factual allegations, and they all revolve around Chymka who became plaintiff's supervisor in September 2005 and remained his supervisor until plaintiff was fired in August 2007.

First, plaintiff alleges Chymka made sexual comments to him. Plaintiff has identified four specific comments: "high maintenance," "hi handsome," "how are we doing today, lover?," and "cutie pie." The term used most often was "high maintenance," which was made almost every other day, and typically spoken in front of co-workers. The other terms were used less frequently and then only in private. Chymka allegedly said "cutie pie" and "hi handsome" a dozen times each and "how are we doing today, lover?" three or four times, all over the 18-plus-month period.

Second, plaintiff claims Chymka would "give me a look like a man was looking at a woman." (Pl. Dep. 126.) When asked what about the look was sexual, plaintiff said: "Just his eyes. Just the way he looked at me, you know, up and down. I don't think he realized what he was doing." (*Id.* at 130.) Plaintiff claims Chymka gave him this "look" continuously, estimated to be three times a week.

Third, on June 6, 2007, Chymka allegedly sexually propositioned plaintiff in the men's bathroom at work by exposing his genitalia to plaintiff and telling plaintiff that he was "good looking" and by saying -- "If I was gay, I would like to be with somebody like you." (Resp. at 3.) Plaintiff complained to Chymka that the remarks made him uncomfortable. Plaintiff claims another employee, Joe Estrada, witnessed the encounter.

Fourth, Chymka allegedly wrote plaintiff up for numerous disciplinary violations which plaintiff

believes were unwarranted and which he says were later resolved in his favor after he filed grievances. As plaintiff states in his affidavit, "I received a substantial upsurge of documentation of purported issues affecting my work following Chymka's placement as my supervisor in September, 2005." (Aff. ¶ 16.)

Plaintiff complained three times about Chymka's behavior. First, as described above, he complained in the bathroom on June 6th. Second, a few weeks *before* the bathroom incident, plaintiff said to Chymka: "You know, Steve, I don't appreciate you talking about little boys and I don't appreciate you telling me about, you know, you go out with your -- you know, you used to go out with your daughter's girlfriend when he was 40 at the time and she was 17. I don't want to hear that stuff." (Pl. Dep. 133-34.) Third, around the same time (*i.e.* late May 2007 and also before the bathroom incident), plaintiff saw Tom Madigan, the plant manager, in the parking lot and said to him: "Well, I'm having problems with Steve Chymka. [] He is harassing me. He's following me everywhere I go. He is constantly on me . . . and he's making sexual innuendos to me." (Pl. Dep. 136.) When Madigan asked for more detail about the alleged sexual innuendos, plaintiff responded: "Well, you know, he's saying certain things that make me uncomfortable, . . . he's calling me, you know, handsome and whatever and I just don't -- I didn't really want to get into the whole thing with him but I just kind of, you know, let him know that I wasn't appreciating it." (*Id.*)

**Analysis.** Plaintiff's Title VII claim has two parts: (1) he was subjected to a hostile environment; and (2) in retaliation for complaining about it, he was fired. The latter part is his main focus, as he has admitted that the hostile environment had no affect on his ability or desire to work for the company and that he spent the majority of his day on the road and only interacted with Chymka briefly upon his arrival to work. *See* Def. Facts 44, 47. Although Holland offers a number of arguments for why plaintiff's Title VII claim fails, we focus on three arguments, finding them dispositive. First, plaintiff has not shown that Chymka's harassment was motived by a desire to discriminate against men in favor of women. Second, plaintiff failed to complain about the most serious allegation of harassment. Third, Holland had a legitimate non-discriminatory reason for firing plaintiff.

**I. The "Because of" Requirement.**

This is a same-sex harassment claim. In *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) the Supreme Court recognized that such a claim is viable under Title VII because the statute does not prohibit a sex discrimination claim merely because "the harasser and the harassed employee are of the same sex." *Id.* at 76. The key inquiry is whether one sex is treated better than the other. In the nomenclature of Title VII, the plaintiff must show that the behavior was perpetrated "because of" the victim's sex. *Id.* at 79. Harassing behavior is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* at 80. The mere fact that a harasser engaged in sexual behavior -- whether it be teasing, juvenile pranks, "male-on-male horseplay," boorish behavior, "intersexual flirtation," or even sexual propositions -- does not necessarily mean Title VII was violated either. *Id.* at 81. For example, Title VII is not violated if a supervisor sexually propositions both male and female employees because, although such behavior would likely be viewed as sexual harassment in a colloquial understanding, it is not motivated by the victim's sex. *See Holman v. State of Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) ("because Title VII is premised on eliminating *discrimination*, inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex, is outside the statute's ambit") (emphasis in original). At the other end of the spectrum are cases where the harasser focuses on one individual, not out of a desire to discriminate based on gender, but due to countless other reasons ranging from personality conflicts to job rivalries. *See, e.g., Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000) ("It is clear that [the two male harassers] lodged sexually explicit insults at [plaintiff] to express their acrimony over work-related disputes, and not to harass him because he is a man.").

Relying on these principles, the Supreme Court in *Oncale* set forth three ways a Title VII plaintiff could meet the "because of" requirement in a same-sex case. First, a plaintiff can show that he received "explicit or implicit proposals of sexual activity, provided that he also comes forward with "credible evidence" that the

harasser was homosexual. 523 U.S. at 80. Second, a plaintiff can show that he was harassed "in such sex-specific and derogatory terms" so as to make it clear that the harasser is motivated by a "general hostility to the presence" of one sex being in the workplace. *Id.* Third, a plaintiff may offer direct comparative evidence showing that the harasser in a mixed-sex workplace treated one sex better than the other. Plaintiff argues he can prevail under all three *Oncale* methods. We disagree.

We begin with the second and third methods because, although they are plaintiff's weaker arguments, they highlight an important larger point. Did Holland -- which is the only defendant as Chymka cannot be liable under Title VII -- treat women better than men? Plaintiff's case rests on this broader assertion. When viewed from this macroscopic perspective, however, plaintiff's claim seems doomed from the outset. This is because *all* truck drivers and *all* dockworkers at the company were men. Plaintiff cannot remember a woman ever working as a truck driver. It appears that all the supervisors were men -- at least every employee mentioned in the current record is a man. The only women at the company, according to plaintiff, were six to eight women doing billing "at night" (Pl. Dep. 55.) There is no evidence that the men driving trucks around Chicago during the day interacted with the women doing billing at night. Accordingly this was not a mixed-sex workplace in any practical sense. We thus find plaintiff cannot proceed under the third method. For similar reasons, he also cannot succeed under the second method. Again, given the all-male workplace for drivers, it is hard to see how any *general* hostility to men exists. Focusing specifically on Chymka, there is likewise no evidence that his comments to plaintiff were based on a broader hostility to men. Importantly, plaintiff states that Chymka was never seen picking on any other man aside from him. (Pl. Dep. 223.)

We turn then to the first *Oncale* method, which is the closest fit and which requires an in-depth review of the facts. This method has two parts. A plaintiff must show that he received a sexual proposition and provide "credible evidence" the person making it was a homosexual. We address the latter requirement, finding it dispositive. Is there credible evidence Chymka was gay? The short answer is no. To begin with, plaintiff has offered a speculative and convoluted explanation about Chymka's sexual orientation. When asked in his deposition whether Chymka was gay, plaintiff surprisingly said no but instead speculated that he was bisexual. (Pl. Dep. 186.) Plaintiff did not explain the basis for this distinction. Perhaps it is because plaintiff has also complained that Chymka once bragged about dating a 17-year old girl (more on his below). *See Johnson v. Hondo, Inc.*, 125 F.3d 408, 412-13 (7th Cir. 1997) (plaintiff's speculation that harasser was gay was "strained" because harasser made sexual comments about liking women). But even if we accept plaintiff's bisexual theory, this raises a separate problem. As noted above, the Seventh Circuit has held that a bisexual harasser does not violate Title VII. *Holman*, 211 F.3d at 401. Recognizing this problem, plaintiff asks us to accept another speculative proposition -- yes Chymka was bisexual in general, but he was not a "practicing" one, at least not while working at Holland. (Resp. at 8.)

Plaintiff has no independent evidence (from, say, co-workers or Chymka's friends) that he was gay or bisexual. Plaintiff's only evidence comes from his own interactions with Chymka -- namely, the looks and comments and the bathroom incident. The comments and looks are, in this Court's view, clearly insufficient. As for "high maintenance," the comment used by far the most, plaintiff doesn't explain how it shows Chymka was gay. According to www.urbandictionary.com, the phrase is defined as "[r]equiring a lot of attention." A brief search in Westlaw's ALLFEDS database likewise does not reveal any obvious or consistent sexual meaning given to this phrase. *See, e.g., Hinds v. Spring/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (company referred to plaintiff as "high maintenance" because he "requir[ed] high-level management and human resources time"). These descriptions actually fit better with defendant's theory that plaintiff had a history of workplace problems requiring extra managerial time. Significantly, when plaintiff was asked how *he* interpreted the phrase, he essentially shrugged his shoulders: "I don't know. I just never paid much attention to it. I really didn't care what he said." (Pl. Dep. 127) Not only is plaintiff unable to attribute any sexual content to the phrase, he also makes clear he didn't find it bothersome. The other three phrases -- "cutie pie," "How we doing today, lover," and "hi handsome" -- at least on their face could be consistent with a romantic overture, but they are so vague and bland as to be equally if not more consistent

with the theory that Chymka was joking. Plaintiff has not provided any witness to corroborate his interpretation. He also fails to give any description of how or when the comments were made.

As for the sexual looks, the same problems exist. How a person looks at another (absent contextual evidence) is hard if not impossible for a jury to objectively evaluate. The Seventh Circuit in general has been skeptical of such vague claims. *See, e.g.*, *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) ("[m]aking an ugly face at someone and staring, while not the most mature things to do, falls short of the kind of conduct that might support a hostile work environment claim").

Although the bathroom incident is a much closer call, we still find it is not credible evidence as required by *Oncale*. To begin with, plaintiff portrays the incident in his brief as more dramatic than it really was. He states (at p. 2-3): Chymka "accost[ed] Warner in the men's restroom, exposing his genitalia to Warner, putting his hand on Warner's shoulder (while exposing his genitalia to Warner)." This description makes it sound as if Chymka walked up to plaintiff and, out of the blue, exposed his genitalia in a bold and uncouth way. But as plaintiff's deposition makes clear, the alleged exposure occurred when the two men were standing side-by-side at urinals. Specifically, the exposure occurred *while* Chymka was urinating. This puts the incident in a different light and makes it much more ambiguous. It is true that Chymka, according to plaintiff, said that "If I was gay, I would like to be with somebody like you." But read literally, the subjunctive "if I was gay" would mean that Chymka was *not* gay. Plaintiff has not explained why this literal meaning should counterintuitively be interpreted as a sexual invitation. To be clear, a jury could certainly believe that Chymka was acting unprofessional or was trying in some way to irritate or tease plaintiff. But the larger inquiry under *Oncale* is whether he was gay. There is no credible evidence he was.

One further point about the bathroom incident. Plaintiff has repeatedly touted the fact that he has a witness to corroborate his story. In his affidavit, he states that Joe Estrada was "present *when* Chymka accosted [him]." (Pl. Aff. ¶ 27; emphasis added.) Here again, plaintiff's rhetoric is not supported by the evidence. Plaintiff's affidavit makes it sound as if Estrada witnessed the exposure. But plaintiff in his deposition conceded that Estrada was in the bathroom stall at the time. (Pl. Dep. 134) He thus could not have seen the exposure. More significant, however, is the fact that plaintiff never got an affidavit from Estrada, despite being given extra time to procure affidavits. This suggests Estrada would *not* corroborate plaintiff.

## II. Failure to Complain About the Bathroom Incident.

Even if the bathroom incident were enough to tip the balance and overcome the *Oncale* problem, plaintiff's claim would fail for a separate reason. He never reported the bathroom incident to anyone at the company, and there is no evidence anyone knew about it. He did complain to Madigan, two weeks before the incident, telling him Chymka had made sexual comments. If plaintiff was willing to complain about tepid comments such as "hi handsome," then why did he not complain about the more flagrant and serious bathroom incident? Not only did plaintiff not complain at the time to anyone in management, he never mentioned it at the Local meeting, nor told it to the Grievance Committee, nor did he mention it in his October 2007 letter to his union (even though he was willing to reveal that he and Chymka had a disagreement at an earlier company). The first time he mentioned the incident appears to be in his deposition in 2010, three years after the event. (Plaintiff claims he told the EEOC in 2008, but we could find nothing in the record to confirm this claim.) By failing to notify the company, plaintiff did not give it a chance to address the problem. All the company knew was that Chymka had made sexual comments and, even then, plaintiff admits he only told Madigan about some of them.

Viewing the record as a whole, we cannot help but notice a pattern in the way plaintiff has complained and communicated with the company. He has shown a tendency, for whatever reason, to keep silent initially about an event or issue and then raise it later (in some cases much later and often after earlier explanations were unsuccessful). As noted above, he waited for three years to reveal the bathroom incident and did so only after other arguments were found unpersuasive. Similarly, as discussed below, he initially did not mention the family crisis explanation. Yet another puzzling instance is when he finally decided to confront Chymka in

May 2007. This was the first time plaintiff had complained to Chymka despite having heard the four comments for over 18 months. This delay in complaining to Chymka itself could be viewed with suspicion, but what it more difficult to understand is that when plaintiff finally confronted Chymka, he did not mention any of the four comments forming the basis of his current claim. Instead he complained about two other comments *not* a part of this lawsuit. One is a comment Chymka made, at some unspecified time and place, about "little boys." Beyond this two-word description, plaintiff offers no explanation about what the phrase means, where it was said, or why it was objectionable. The second comment is when Chymka told plaintiff that he once dated his "daughter's girlfriend when he was 40 at the time and she was 17." (Pl. Dep. 133-34.) But it turns out this comment was made when Chymka and plaintiff worked together for a different company, called Hyman, well before they worked together for Holland. The time was between 1993 and 1996. (Pl. Dep. 35.). In other words, plaintiff waited over *eleven years* before complaining about the 17-year-old-girlfriend comment. It was this comment, made only once while the two men were at a truck stop over a decade earlier, that was foremost in plaintiff's mind when he finally confronted Chymka in May 2007.

This latter comment also suggests the two men had a simmering dispute going back many years. It casts doubt on plaintiff's theory that Chymka was trying in 2005 and 2006 to woo him into a romantic relationship or sexual tryst. Rather, it supports the alternative interpretation that Chymka made the comments such as "hi handsome" to irritate plaintiff because the two men did not like each other. It does not help matters that when first asked in his deposition about whether he got along with Chymka when they worked at Hyman, plaintiff did not mention this comment and gave the impression the two men were friendly. *See* Pl. Dep. 40 (testifying that he and Chymka got along at Hyman and Chymka "seemed like he was okay"). But later in his deposition, when confronted with his October 2007 letter to his Union, plaintiff conceded the two men had disagreements at Hyman, thus suggesting they were not friendly. (Pl. Dep. 212.)

### III. Pretext.

Even if plaintiff could get past the above two hurdles, we would still grant summary judgment on the issue of pretext. For plaintiff to ultimately prevail, he must prove that the company's explanation for firing him (proven dishonesty) was a cover up -- in other words, a lie. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). It is not enough to show that it was unfair or even inaccurate. *Id.* Plaintiff tries to poke holes in the company's explanation by raising a number of different arguments. As explained below, these arguments are insufficient to avoid summary judgment.

Logically, the first point to address is plaintiff's assertion that the surveillance report is hearsay and that Holland should have submitted an affidavit from its author. (Pl. Resp. at 7.) Plaintiff seems to be suggesting (without explicitly making the argument) that his manifest was accurate. As a matter of litigation strategy, it is surprising plaintiff ventures down this path. He has made a number of statements essentially admitting the manifest was inaccurate. In his deposition, he testified that "the first couple stops [on his manifest] are all accurate" and then he went on to explain how the family crisis emerged, the clear implication being that the manifest was inaccurate *after* the first stops. (Pl. Dep. 170-71.) He also testified that he "wasn't paying attention [to his manifest] because I had other things on my mind." (*Id.* at 169-70.) Plaintiff also admitted there were "other discrepancies" aside from the two-hour lunch. (*Id.*) In his affidavit, plaintiff stated that his manifest "showed discrepancies." Perhaps the strongest evidence is plaintiff's deposition testimony about his conflict with Urbaniak during the grievance process. Plaintiff testified he wanted to be "honest" with the Committee about the Unisource error, but Urbaniak told him to keep quiet. While plaintiff blames Urbaniak, the larger inescapable conclusion is that plaintiff was not honest. It is really a double admission of dishonesty, originally on the manifest and then again later at the hearing. And it is disingenuous for plaintiff to ask Holland to produce the authors of the surveillance report because one of them was present at the Local meeting on August 28, 2007. (Pl. Dep. 167.) But plaintiff didn't raise questions then about the authenticity of the report. Now, long after it has been assumed the report was accurate, plaintiff tries to cast doubt on it.

Plaintiff next offers various explanations as to *why* the manifest was false, his main excuse being the

**STATEMENT**

family crisis. This argument, while more reasonable, fails to cast doubt on the company's explanation. By arguing he was justified in taking a two-hour lunch to deal with the family crisis, plaintiff overlooks the nature of the violation. It is not whether he was justified in taking a two-hour lunch but whether he *honestly reported* what he did. This is not a trivial issue. As the company has explained, the margins in the trucking industry are small, and the company requires drivers to fill out a manifest recording the time (accurate to the minute) of each arrival and departure. (Blubaugh Aff. ¶¶ 5-7.) Drivers are also required to "maintain constant communication with the terminal's dispatch office, acknowledging their whereabouts," and to inform dispatch of delays over 15 minutes. (*Id.*) Accurate real-time reporting is important to the company.

As for the merits of the family crisis excuse, did the company have a rational basis for disbelieving it? Yes. For one thing, the company could find it suspicious that plaintiff did not disclose it until almost a month later. On the day of the crisis, he talked to the dispatcher but did not disclose that he was dealing with a family crisis, saying later it was none of the dispatcher's business. Four days later, when asked to explain why he took a two-hour lunch, he again didn't mention it, stating that he couldn't remember what he did. The company reasonably could have found this claim of faulty memory to be suspicious given that the event happened only four days earlier and involved an unusual and important matter.

Another key fact underlying the company's decision not to believe plaintiff is that he had a history of violating company rules, including cases where he took a long lunch. Specifically, the company has listed 15 incidents where plaintiff was disciplined. (Def. St. of Fact # 27.) The first is on December 8, 1997, and seven of the 15 incidents occurred before Chymka became plaintiff's supervisor. (*Id.*) For example, on January 9, 2004, plaintiff was given a warning letter for misuse of company time when he took "excessive time while delivering freight" and then was "unable to offer a reasonable explanation." (Ex. 20; Pl. Dep. 123). Similarly, on November 10, 2005, plaintiff was given a warning letter for taking a long lunch. (Ex. 21 at D00415; Dep. at 143 (plaintiff admits to conduct).) A number of these incidents are similar to the allegations here. Although plaintiff complains in general that the violations were unfounded, he admitted in his deposition that, for a number of them, he either did the conduct alleged or he couldn't remember whether he did. Thus, even if we give plaintiff the benefit of the doubt and assume that *some* of the incidents were not well founded it is still true and undisputed that he had a significant number of violations.

But the biggest problem for plaintiff's pretext argument is that the Grievance Committee upheld the company's decision. This Committee was independent of the company, and it came to the same conclusion as the company after listening to plaintiff's arguments. This is strong evidence that the company's decision had a rationale basis. Plaintiff tries to cast doubt on the Committee's decision by speculating that a Union member on the Committee "had in the past been friends of Holland terminal manager Tom Madigan. (Pl. Aff. ¶ 14.) But this evidence is hearsay and vague, and insufficient to allow a jury to conclude that the company somehow through this friendship (assuming it existed) manipulated the grievance committee.

We turn finally to plaintiff's third major argument, which is that the punishment did not fit the crime. Although this argument is his most reasonable, we still find it insufficient. Plaintiff argues that other drivers who were fired for proven dishonesty were later reinstated after being given a two-week suspension. The difficulty with this argument is that it does not cast doubt on the company's explanation. The company has consistently maintained that plaintiff's long history of workplace problems distinguished his case. As Neal London stated, "[i]f it was anybody but Craig Warner, I'd believe it." To get around this fact, plaintiff would have to point to other workers who were fired *and* who had a similar long history of violations. *See Amrhein v. Health Care Service Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (other employees did not have same disciplinary history). This he has not done. Moreover, by plaintiff's own admission, he was not truthful in the grievance process. For all we know, these other men, unlike plaintiff, were honest after being confronted. It is plaintiff's burden to marshal the evidence on this point. For these reasons, the motion for summary judgment is granted.